# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# COLUMBIA DIVISION

| | |
|---|---|
| **JEFFERY C. ANDERSON,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> **INTERNATIONAL COMFORT** ) <br> **PRODUCTS, LLC,** ) <br> ) <br> **Defendant.** ) | **NO. 1:16-cv-00004** <br> **CHIEF JUDGE CRENSHAW** |

## MEMORANDUM OPINION

Jeffery C. Anderson sued the entity he identified as "International Comfort Products, LLC," ("ICP") in Marshall County Circuit Court, pleading various claims related to ICP's treatment and eventual termination of Anderson as an employee in 2014. (Doc. No. 1-1.) ICP removed the case to this Court pursuant to diversity of citizenship. (Doc. No. 1.) At the same time, ICP noted that International Comfort Products, LLC, is itself no longer in operation, its business having been merged with Carrier Corporation ("Carrier"), a Delaware entity. (Id. at 2.) ICP/Carrier has filed a Motion for Summary Judgment (Doc. No. 31), and Anderson has filed a Response (Doc. No. 45), to which ICP/Carrier has filed a Reply (Doc. No. 46). For the reasons discussed below, ICP/Carrier's Motion will be GRANTED and summary judgment will be entered in its favor on all claims.

## I. BACKGROUND

In 1987, Anderson, an African-American man, was hired by Heil-Quaker Corporation, a predecessor of ICP. ICP was formed on September 25, 2003, and was merged into Carrier on December 31, 2012. (Doc. No. 6 at ¶ 5; Doc. No. 38 at ¶ 7.) Carrier characterizes itself as "the world's leader in high-technology heating, air conditioning, and refrigeration solutions." (Doc. No.

38 at ¶ 1.) Between July 2001 and March 2005, Plaintiff worked as a customer service manager. In January 2005, Plaintiff accepted a new position as a sales account manager, also known as a "regional business manager" or "RBM." RBMs are responsible for specific, defined territories, in which they are expected to build and maintain relationships with customers and distributors in order to drive ICP/Carrier's sales and grow its business. (Id. at ¶¶ 8−9.)

As an RBM, Anderson was subject to a system of annual performance reviews that rated him on a scale from 1 to 4, with 1 representing the lowest level of performance and 4 the highest. (Id. at ¶ 10.) The evaluations included ratings on a number of discrete components reflecting individual aspects of the employee's performance, as well as an overall rating reflecting a comprehensive assessment of the employee. (See, e.g., Doc. No. 33-4, ex. I.) On January 13, 2006, Anderson's supervisor, Robert Arena, gave him an overall rating of "2 – Progressing." Arena wrote that Anderson "demonstrated competency in his last position and has shown enthusiasm for his new position and actively taken on the challenge." Arena noted that he "expect[ed] [Anderson] to continue to grow into the position as he gains experience." (Doc. No. 38 at ¶ 10.)

In 2006 and most of 2007, Anderson was supervised by Thomas Boothe. (Doc. No. 38-5, ex. H.) In 2006, Boothe gave Anderson an overall rating of "3 - Fully Competent Performance," and Boothe has attested that he eventually completed a 2007 evaluation doing the same. (Id.; see Doc. No. 33-4 at 38 (assigning verbal descriptors to numerical ratings).) In November of 2007, however, ICP hired Charles Piranian, who became Anderson's new supervisor. (Doc. No. 38 at ¶ 11.) Around the end of 2007, Piranian completed an evaluation for Anderson that revised his overall rating down to "2 – Progressing." (Id. at ¶ 13.)

Anderson complained about the change in his overall rating to human resources. Although Anderson and ICP/Carrier differ somewhat in their characterization of Anderson's complaint, they

2

generally agree that Anderson disputed the fairness of Piranian revising downward an already completed evaluation performed by Boothe, a supervisor who had had significantly greater opportunity to observe Anderson's work. (Id. at ¶ 14.) ICP ultimately revised the evaluation back to the original, more favorable overall rating of "Fully Competent Performance." (Id. at ¶ 15.) The evaluation, however, retained some individual components on which Anderson still received a "Progressing" rating. (Id. at ¶ 16.)

At some point in 2008, Anderson received another new supervisor, Robert Angell, who, like Anderson, was a veteran ICP employee. (Id. at ¶¶ 19−20.) Angell's evaluation of Anderson for 2008 gave him an overall rating of "Progressing." (Doc. No. 33-4, ex. L at D000054.) Anderson did not complain about the evaluation. (Doc. No. 38 at ¶ 23.) Angell continued to supervise Anderson, and gave him "Fully Competent" overall scores in 2009, 2010, and 2011. (Id. at ¶ 24; Doc. No. 33-4, exs. M, N, O.) These evaluations did, however, continue to reflect some criticism of aspects of Anderson's performance. For example, in 2010, Angell wrote, "I feel Jeff is competent, but I struggle to say 'fully competent' based on a 3rd successive year of down $$$ and down share in the territory. Jeff must continually challenge his group of distributors to grow and match the goals the organization sets for them." (Doc. No. 33-4, ex. N at D000060.) The same evaluation nevertheless praised Anderson's "great relationshi[p]s with his accounts" and "great understanding of our pricing model and what can be done within the model to meet market demands for our distributors." (Id.)

Angell's evaluations of Anderson for 2012 and 2013 gave him "Progressing" ratings. (Doc. No. 33-4, ex. Q at D000066, ex. S at D000071.) In early 2014, management took steps to put Anderson on an Employee Improvement Plan ("EIP"). (Doc. No. 38 at ¶ 32.) The EIP identified three desired areas of improvement for Anderson: (1) distributor oversight and direction; (2)

overall communications with distributors and the sales team; and (3) strategic and tactical account management of overall territory. (Doc. No. 33-4, ex. R at D000027−28.) Each was associated with specified "Means of Improvement" and "Success Criteria." (Id.) The "Means of Improvement" for the action area involving overall communication included the instruction to "[u]tilize sales planning tool and call visit log." (Id. at D000027.) The "Means of Improvement" for the action area involving strategic and tactical account management identifies a specific sales target of $12,162,472 for Q2 of the fiscal year. (Id. at D000028.)

Around the same time, however, Anderson took two medical leaves of absence from work: from March 12, 2014 to May 22, 2014, and July 22, 2014, to August 25, 2014. (Doc. No. 38 at ¶ 36.) Anderson maintains that the leave was necessary because he was unable to work due to an apparently diabetes-related open wound on his foot. (Id. at ¶¶ 39−40.) The parties disagree with regard to whether the EIP process was initiated before or after the start of the first leave of absence. (Id. at ¶ 36.) On July 28, 2014, however, early during the second leave of absence, ICP/Carrier human resources manager Ebony Nevels sent Anderson an email informing him that ICP/Carrier had decided to "place a hold on the EIP process until you return to full duty." (Doc. No. 33-4, ex. T.)

ICP/Carrier maintains that, about a month after Anderson returned to work, Angell reviewed Anderson's use of the management tool and call log mentioned in his EIP and found their contents unsatisfactory. (Doc. No. 38 at ¶ 43.) Angell has also described his dissatisfaction with the frequency of Anderson's face-to-face visits with customers. (Doc. No. 33-4, ex. D at 39.) In his deposition testimony, Anderson conceded that he had struggled to complete his call log, but complained that other employees had not been required to fill out such logs. (Doc. No. 33-2 at 190−91.) Anderson also failed to meet the EIP's Q2 sales target. He argues, however, that it was

4

unfair to fault him for failing to meet the goal in light of the fact that he missed a substantial amount of time for medical leave. (Doc. No. 38 at ¶ 45.)

On November 4, 2014, Angell performed an assessment of Anderson's performance under the EIP. (Doc. No. 33-4, ex. V.) The assessment noted progress in some areas, but also included a number of critical comments. For example, regarding "distributor oversight and direction," Angell wrote:

> No call/visit logs shared to date as requested 10/6. Jeff has made more efforts to visit with accounts but still adds no value when meeting. His distributors do not look to him for knowledge, insight, industry information, etc. [R]ecently I asked a distributor principal . . . if Jeff discussed our recent [product bulletins] with him and he had not.

(Id. at D000002.) Regarding Anderson's "overall communications," Angell wrote:

> Jeff ultimately has never been able to position himself as an active leader within his distributor accounts. This is evident by the lack of customer interface he is included in with his accounts. When his accounts are asked about how much time Jeff accompanies their salespersons on sales calls I get answer like "never", "none", [and] "Jeff offers but we handle that[."] Again Jeff has not proven to his accounts that he adds value here.

(Id. at D000003.) Angell's assessment of the action item involving "strategic and tactical account management" noted a decline in sales as well as Anderson's failure to provide requested information. (Id.) Finally, Angell wrote that Anderson had not demonstrated "effective performance against the plan" and recommended Anderson's termination. (Id. at D000004−05.) Anderson disputes the fairness of the November 2014 assessments and contrasts them with his earlier, favorable annual reviews. (Doc. No. 38 at ¶ 46.) He characterizes the recommendation that he be terminated as the culmination of discrimination that began with Piranian's attempt to revise his annual rating in 2007. (Id. at ¶ 48.) Angell and Nevels informed Anderson that he was terminated on November 24, 2014. (Id. at ¶ 49.) In 2015, ICP/Carrier hired a Caucasian RBM for

5

Anderson's former territory, although ICP/Carrier maintains that, at or around the same time, it hired a new African-American RBM in Texas. (Id. at ¶ 53.)

Anderson filed suit in Marshall County Circuit Court on November 23, 2015. (Doc. No. 1-1.) The Complaint raises three causes of action: race discrimination under the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4–21–101 et seq.; disability discrimination under the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8–50–103; and retaliation under the THRA and/or the TDA. (Doc. No. 1-1 at 6.) ICP/Carrier removed the case to this Court on January 19, 2016, and it was initially assigned to Judge Kevin Sharp. (Doc. No. 1; Doc. No. 3.) On May 2, 2016, Judge Sharp entered an Initial Case Management Order setting a jury trial for August 22, 2017, and requiring "all Motions to Amend" to be filed on or before September 2, 2016. (Doc. No. 11 at 3, 5.) On September 14, 2016—shortly after the deadline for motions to amend had passed—the case was reassigned to Judge William J. Haynes, Jr. (Doc. No. 17.) Upon Judge Haynes' retirement, the case was again reassigned, this time to the undersigned. (Doc. No. 21.) Upon this final reassignment, the Court entered a new Case Management Order that maintained the August 22, 2017 trial date. (Doc. No. 22 at 1.) ICP/Carrier thereafter filed its Motion for Summary Judgment. (Doc. No. 31.) After ICP/Carrier filed its Motion, Anderson filed a Motion for Leave to File an Amended Complaint, seeking to correctly name Carrier, to add a claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654, and to make minor additional corrections. (Doc. No. 44.) Magistrate Judge Barbara D. Holmes denied that Motion on July 14, 2017. (Doc. No. 48.)

## II. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Pennington v. State Farm Mut. Auto. Ins. Co., 553 F.3d 447, 450 (6th Cir. 2009). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). In deciding a motion for summary judgment, the Court must review all the evidence, facts and inferences in the light most favorable to the nonmoving party. Van Gorder v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Court determines whether sufficient evidence has been presented to make the material issue of fact a proper jury question. Id. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party. Rodgers, 344 F.3d at 595.

### B. Prima Facie Case of Race Discrimination

Analysis of a discrimination claim under the THRA follows the same framework as under Title VII of the Federal Civil Rights Act. Bredesen v. Tenn. Judicial Selection Comm'n, 214 S.W.3d 419, 430 (Tenn. 2007); Lynch v. City of Jellico, 205 S.W.3d 384, 399 (Tenn. 2006). When, as here, an employee attempts to use indirect evidence to prove discrimination, the Court applies the familiar burden-shifting test announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Barrett v. Whirlpool Corp., 556 F.3d 502, 515 (6th Cir. 2009); Geiger v. Tower Auto.,

579 F.3d 614, 622 (6th Cir. 2009). Anderson must establish his prima facie case of discrimination by showing that (1) he is member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position at issue; and (4) he was treated differently than similarly-situated non-protected employees. Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006). If the plaintiff succeeds in making out the elements of a prima facie case, the burden of production of evidence shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions. Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007). If the employer satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. Id. "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." Id.

ICP/Carrier argues that it is entitled to summary judgment with regard to Anderson's race discrimination claim for three reasons: (1) he is unable to establish that he was qualified for the position from which he was terminated; (2) he has failed to show that he was treated differently from similarly situated non-protected employees; and (3) even if he can establish a prima facie case, ICP/Carrier has proffered a legitimate, non-discriminatory reason for his termination and Anderson has produced no evidence suggesting that that reason is pretextual.

In an effort to demonstrate that Anderson was not qualified for his position, ICP/Carrier points to his mixed performance reviews, his allegedly unsatisfactory performance under the EIP, and his supervisors' testimony about issues they had with his work. These same factors, however, also make up the entirety of its proffered legitimate, non-discriminatory reason for terminating him. "The Sixth Circuit has held that in anti-discrimination cases district courts should assess whether the plaintiff is 'otherwise qualified' for his or her position at the prima facie stage without considering the employer's legitimate, nondiscriminatory reason for its adverse action against the

8

plaintiff." Hill v. Shoe Show, Inc., No. 13-2931-STA-CGC, 2015 WL 4527722, at *6 (W.D. Tenn. July 27, 2015) (citing White v. Columbus Metro. Hous. Auth., 429 F.3d 232, 242 (6th Cir. 2005); Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 585 (6th Cir. 2002); Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 662–63 (6th Cir. 2000)); see also Spencer v. Nat'l City Bank, 732 F. Supp. 2d 778, 789 (S.D. Ohio 2010) ("[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." (quoting Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003)). "[T]he case law indicates that courts engage in impermissible consideration of the defendant's proffered legitimate non-discriminatory reason during the first step of the McDonnell Douglas analysis when they cite the defendant's proffered reason in finding that the plaintiff is not qualified for the position and thus has failed to meet the second prong of the prima facie analysis." White, 429 F.3d at 242.

In ICP/Carrier's version of events, the issues that arose in Anderson's evaluations and EIP were the ultimate non-discriminatory reason for his termination. ICP/Carrier therefore cannot rely on those facts alone to show that Anderson was unqualified. Moreover, other than, at most, his final assessment under the EIP, Anderson's evaluations do not depict a person who was definitively unqualified, but rather an employee with some strengths and some weaknesses and whose performance, though not consistently to the high level desired, also did not necessarily fall below reflecting the minimum qualifications for his position. ICP/Carrier has not shown a lack of disputed material facts with regard to this prong.

ICP/Carrier argues next that Anderson has failed to identify similarly situated employees who were treated differently than he was treated. Anderson suggests that he can be compared to Angell himself, who had served as an RBM before becoming Anderson's manager. (Doc No. 45

9

at 9.) Anderson offers an affidavit of a coworker, Bill Lowery, attesting that Angell's "emotional and difficult" personal issues led to problems with customers, including at least one customer whose conflict with Angell had to be rectified by Anderson and Lowery. (Doc. No. 38-5, ex. I at ¶¶ 10−12.) Another coworker, Steve Allemore, has attested that unspecified complaints were made against Angell when he was an RBM and identifies one Nashville customer that went so far as to bar Angell from all of its locations. (Doc. No. 38-5, ex. J. at ¶ 14.) Anderson characterizes Angell's behavior as having caused significant financial loss to ICP. (Doc. No. 38-5, ex. G. at ¶ 14.) Anderson's argument, in essence, is that Angell created problems with customers that exceeded any that Anderson caused, but Angell was promoted rather than being placed on an EIP and eventually fired.

"Superficial similarities between a disciplined employee and his colleagues are not sufficient to show a prima facie case of discrimination." Arendale v. City of Memphis, 519 F.3d 587, 604 (6th Cir. 2008). Although an employee is "not required to demonstrate an exact correlation between himself and others similarly situated," he must at least show "that he and his proposed comparators were similar in all relevant respects, and that he and his proposed comparators engaged in acts of comparable seriousness." Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 751 (6th Cir. 2012); accord Jackson v. VHS Detroit Receiving Hosp., Inc., 814 F.3d 769, 777 (6th Cir. 2016); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). The question of what constitutes "all relevant respects" may vary depending on the facts of the particular case. Ercegovich., 154 F.3d at 352. Accordingly, a district court "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." Batuyong v. Gates, 337 F. App'x 451, 454 (6th Cir. 2009) (quoting Ercegovich, 154 F.3d at 352).

Generally speaking, though, the question of whether a proposed comparator employee was similarly situated to a terminated or disciplined plaintiff considers whether the proposed comparator "[1] dealt with the same supervisor, [2] [was] subject to the same standards and [3] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (citing Mazzella v. RCA Glob. Commc'ns, Inc., 642 F. Supp. 1531 (S.D.N.Y. 1986), aff'd, 814 F.2d 653 (2d Cir. 1987); Lanear v. Safeway Grocery, 843 F.2d 298 (8th Cir. 1988); Cox v. Elec. Data Sys. Corp., 751 F. Supp. 680 (E.D. Mich. 1990)); but see Ercegovich, 154 F.3d at 352 (cautioning against extrapolating Mitchell factors to all cases).

Anderson ultimately falls short of establishing that Angell was similarly situated in a number of key respects. First, Angell's promotion to the position of Anderson's supervisor took place in 2008—meaning that his position stopped being comparable to Anderson's several years before Anderson's termination. There are numerous legitimate reasons why an employer might not treat its employees the same way it treated them many years earlier, from changes in the relevant labor market to an overhaul of management philosophy to evolving norms within the employer's industry. Accordingly, the search for a similarly situated employee should embrace at least some general sense of contemporaneousness or at least temporal proximity.

Second, using Angell as the comparator necessarily means comparing employees with different managers, because Angell himself was a public and explicit participant in Anderson's negative evaluations and eventual termination. While there may have been some overlap between the supervisors Angell and Anderson dealt with as RBMs, the record unambiguously places Angell at the center of Anderson's falling out of favor with ICP/Carrier and the eventual recommendation

that Anderson be terminated. The appropriate comparator for Anderson would therefore be another RBM supervised by Angell, not Angell himself.

Finally, Angell's alleged deficiencies as an RBM—insofar as they are even identified beyond vague innuendo—were simply qualitatively different from Anderson's. Anderson's negative evaluations accuse him of a steady, persistent failure to provide value to customers, taking particular issue with his lack of direct customer engagement. Although the portions of the record that Anderson cites to establish Angell's transgressions lack much detail, the accusations against Angell, as far as the Court can tell, appear to be concerned not with a failure to engage clients or provide value, but with alienating customers and/or engaging in unprofessional behavior. (Doc. No. 38-5, ex. G. at ¶ 14, ex. I at ¶¶ 10−12, ex. J. at ¶ 14.) Although the alleged shortcomings of either Anderson or Angell could plausibly support an adverse employment action, those respective shortcomings are sufficiently different from each other that they create, at best, an imperfect basis for comparison. See Dickens v. Interstate Brands Corp., 384 F. App'x 465, 470 (6th Cir. 2010) (concluding that employees were not similarly situated due to "qualitatively different nature" of misconduct).

Taken together, these undisputed differences render Angell an inadequate comparator for the purpose of Anderson's prima facie case. Because Anderson has not identified a sufficiently similarly situated employee who was treated differently than he was treated, he has failed to establish a disputed issue of material fact with regard to his prima facie case of race discrimination. ICP/Carrier is entitled to summary judgment on this count.

## C. Prima Facie Case of Disability Discrimination

"Generally speaking, discrimination claims under the Tennessee Disability Act, Tenn. Code Ann. § 8–50–103 [et seq.,] are comparable to [Americans with Disabilities Act ("ADA")] claims, and courts may evaluate them using federal cases interpreting the ADA for guidance." Burress v. City of Franklin, Tenn., 809 F. Supp. 2d 795, 817 (M.D. Tenn. 2011) (citing Barnes v. Goodyear Tire & Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000)). The ADA provides that no covered entity shall discriminate against a qualified individual on the basis of a disability. 42 U.S.C. § 12112(a). The ADA defines "disability" as: (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual," (2) "a record of such an impairment," or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)–(C); Tenn. Code Ann. § 4-21-102(3)(A) (TDA) (same).

The state and federal statutes differ, however, with regard to whether an employer is required to offer reasonable accommodations to an employee whose disability would otherwise interfere with performing the duties of his position. The ADA's definition of discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity." 42 U.S.C. § 12112(b)(5)(A). In contrast, the "language of the TDA differs from that of the ADA insofar as the former does not contain a 'reasonable accommodation' element." Burress, 809 F. Supp. 2d at 817. Accordingly, Anderson cannot premise his TDA claim on ICP/Carrier's failure to provide him with reasonable accommodations, such as reduced travel expectations.

To establish a claim for disability discrimination using indirect evidence, a plaintiff must first establish a prima facie case of discrimination by showing that:

> (1) he or she is disabled, (2) he or she is otherwise qualified for the position . . . ,[1] (3) he or she suffered an adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

Ferrari v. Ford Motor Co., 826 F.3d 885, 891−92 (6th Cir. 2016) (citations omitted). If the plaintiff establishes each element of his prima facie case, the burden shifts to the defendant to offer a legitimate explanation for its action. If the defendant does so, the burden then shifts back to the plaintiff to introduce evidence showing that the proffered explanation is pretextual. Id. ICP/Carrier concedes, for the purpose of this Motion only, that Anderson is disabled under the TDA. (Doc. No. 32 at 20.) ICP/Carrier also appears not to dispute that, insofar as Anderson's condition constituted a disability, ICP/Carrier was aware of it. (Id.) Rather, ICP/Carrier argues that it is entitled to summary judgment on this claim because (1) Anderson was not qualified for his position and (2) it has articulated a legitimate, non-discriminatory reason for his termination, and Anderson has not produced evidence tending to show that that reason is pretextual.

ICP/Carrier's argument that Anderson is not qualified for his position fails under this claim for the same reason that argument failed with regard to his race discrimination claim. Anderson's evaluations do not establish that he was unqualified, and, even if they arguably did, relying on them at this juncture would improperly mix the first and second stages of the burden-shifting analysis.

---

[1] Under the ADA, unlike the TDA, the second element of the prima facie case requires only that the plaintiff show that "he or she is otherwise qualified for the position *with or without reasonable accommodation*." Ferrari, 826 F.3d at 891.

**D. Pretext**

Anderson's allegedly deficient performance and his failure to meet the requirements of the EIP, while insufficient to show that he was unqualified, do constitute legitimate, non-discriminatory reasons for his termination, shifting the burden back to Anderson to produce evidence of pretext. "[P]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" Montell v. Diversified Clinical Servs., Inc., 757 F.3d 497, 508 (6th Cir. 2014) (quoting Chen v. Dow Chem. Co., 580 F.3d 394, 400 n. 4 (6th Cir. 2009)). A plaintiff can show that his employer's proffered reasons were pretext by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [his discharge], or (3) that they were insufficient to motivate discharge." Blizzard v. Marion Tech. Coll., 698 F.3d 275, 285 (6th Cir. 2012) (quoting Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 349 (6th Cir. 2012)). "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, [the] prima facie case is sufficient to support an inference of discrimination at trial." Montell, 757 F.3d at 508 (quoting Chen, 580 F.3d at 400 n. 4).

Anderson offers the following evidence in support of a finding of pretext: (1) in 2008, Piranian required Anderson to give up his office space for a new employee, which he did not require of a Caucasian RBM; (2) Piranian embarrassed Anderson in 2008 by congratulating all RBMs but him; (3) Anderson's negative reviews coincided generally with the election and reelection of President Barack Obama, and some ICP/Carrier employees made jokes about President Obama in the workplace; (4) Anderson and some coworkers testified that ICP/Carrier's sales management tool was unworkable; (5) ICP/Carrier has failed to identify any customer complaints in Anderson's personnel file; (6) before receiving his negative evaluations in 2012 and

15

2013, Angell had received positive evaluations demonstrating his value and competence; (7) coworkers of Anderson attested that he was an effective and valued employee; (8) it was unfair to judge Anderson negatively for failing to meet a sales target for a quarter where he missed a significant amount of time due to illness; (9) Angell had social relationships with customers who were supposedly unsatisfied with Anderson; and (10) Angell allegedly undermined Anderson's client relationships and made it more difficult for him to meet ICP/Carrier's expectations. (Doc. No. 45 at 9, 12−16.)

The first two of these reasons demonstrate, at most, a bad relationship between Piranian and Anderson in 2008. No reasonable jury, however, could extrapolate from those facts that the reason given for his termination several years later was pretextual. Any connection between the 2008 and 2012 presidential elections and Anderson's termination is likewise pure conjecture. While the absence of customer complaints against Anderson is at least more closely related to his job performance, ICP/Carrier does not rely on the proposition that Anderson was the subject of formal customer complaints. Rather, ICP/Carrier maintains that Anderson was insufficiently proactive in building customer relationships and that his performance fell below expectations. The alleged issues with the management tool and holding Anderson to a sales target despite his absences similarly fall short of establishing pretext by failing to contradict or undermine the legitimacy, rather than merely the fairness, of the stated reason for Anderson's termination. Most of what Anderson has offered are reasons that one might consider his termination unfair or unduly harsh—not evidence that ICP/Carrier's stated grounds were pretext. See Bender v. Hecht's Dep't Stores, 455 F.3d 612, 627 (6th Cir. 2006) (cautioning courts considering proffered reasons not to "act[ ] as a 'super personnel department,' overseeing and second guessing employers' business decisions").

Nor can Anderson establish pretext simply by pointing to his earlier, more positive evaluations or the positive opinions of his coworkers. A positive review one year is, in and of itself, not necessarily evidence that a negative review the next year is false. In Anderson's case, moreover, even his positive evaluations are consistent with the proposition that he continued to have significant room for improvement. The testimony of Anderson's coworkers fails to establish pretext for similar reasons. That testimony suggests that Anderson was a respected colleague who performed many tasks of his job well. ICP/Carrier has never maintained, though, that Anderson was wholly without merit as an employee, and indeed even his negative reviews depict both strengths and weaknesses. The testimony of Anderson's colleagues may suggest that ICP/Carrier failed to adequately value Anderson's strengths, but it is not sufficient to permit a jury to conclude that the reasons given for his termination were pretext.

Anderson's argument that his alleged failures were at least in part the result of Angell's undermining, however, warrants closer scrutiny. According to ICP/Carrier's documentation, Anderson was terminated in significant part based on Angell's assessment that Anderson had failed to meet goals that Angell himself had played a significant role in setting. If Angell was, at the same time, actively sabotaging Anderson's pursuit of those goals, a reasonable jury could conclude that Angell's proffered concerns were pretextual. Moreover, if the appearance that Anderson had failed to meet expectations was based only on comments from customers who were friends of Angell, then that might—in the context of other evidence that Anderson was orchestrating Angell's predicament—support an inference of pretext. The actual evidence that Angell was undermining Anderson, however, is limited at best.

Anderson has attested that Angell would meet with and maintain social relationships with Anderson's customers, effectively bypassing Anderson. (Doc No. 38-5, ex. G at ¶¶ 18−19.)

17

Angell's maintaining relationships with Anderson's clients, however, is entirely consistent with ICP/Carrier's stated reason for his dismissal. Anderson's evaluations suggested that he failed to proactively maintain and develop those relationships himself. It is unsurprising, then, that Angell would fill the void that he perceived in Anderson's performance.

Anderson has also complained that he did not receive a large Nashville-based account that should have been assigned to him, and which would have helped him meet sales goals. (Doc. No. 38-3 at 197−98.) The assignment of the large Nashville account might be sufficient to show pretext if Anderson had been terminated solely for a failure to meet ICP/Carrier's desired sales number. His evaluations, however, show that his sales figures for the relevant period were just one part of a more holistic negative assessment that focused not only on raw sales but Anderson's actions, his perception by customers, and his failure to provide information required by the EIP process. At most, Anderson's being denied the Nashville account mitigates one of several factors that went into the final decision to terminate him. That is insufficient to satisfy Anderson's burden to produce evidence that could lead a reasonable jury to find that ICP/Carrier's stated reasons for his termination were pretext. Accordingly, Anderson is entitled to summary judgment on his claim of disability discrimination. Had Anderson satisfied his prima facie case of race discrimination, his failure to produce sufficient evidence to demonstrate pretext would mandate summary judgment in favor of ICP/Carrier on that claim as well.

### E. Retaliation

To establish a prima facie case of retaliation, the plaintiff must show that: (1) he or she engaged in protected activity; (2) the exercise of protected rights was known to the defendant; (3) the defendant took an adverse employment action against the plaintiff, and (4) there was a but-for causal connection between the protected activity and the adverse action. Univ. of Texas Sw. Med.

Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013); Taylor v. Geithner, 703 F.3d 328, 336 (6th Cir. 2013). If a plaintiff "succeed[s] in making out the elements of a prima facie case of retaliation, the burden of production shifts to [the defendant] to articulate a legitimate, non-retaliatory reason for" its adverse employment action. Evans v. Prof'l Transp., Inc., 614 F. App'x 297, 300 (6th Cir. 2015) (citing Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007)). In addition to the aforementioned arguments about its legitimate, nondiscriminatory reason for terminating Anderson, ICP/Carrier argues that it is entitled to summary judgment on Anderson's retaliation claim because (1) he did not engage in a protected activity and (2) he cannot demonstrate causation between any such activity and his termination.

In his Complaint, Anderson claims that ICP/Carrier unlawfully retaliated against him "for the exercise of right[s] protected by the Tennessee Human Rights Act and Tennessee Disability Act." (Doc. No. 1-1.) In his Response to ICP/Carrier's Motion, he re-casts this claim as one for retaliation for the exercise of his FMLA, not THRA or TDA, rights. (Doc. No. 45 at 8.) The Court construes this as Anderson either conceding or abandoning his claim for retaliation under the THRA or TDA. See Brown v. VHS of Mich., Inc., 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." (citing Hicks v. Concorde Career Coll., 449 F. App'x 484, 487 (6th Cir. 2011); Clark v. City of Dublin, 178 F. App'x 522, 524–25 (6th Cir. 2006); Conner v. Hardee's Food Sys., 65 F. App'x 19, 24–25 (6th Cir. 2003); Colston v. Cleveland Pub. Library, No. 1:12–CV–204, 2012 WL 3309663, at *2 n.2 (N.D. Ohio Aug. 13, 2012))). The Court accordingly will grant ICP/Carrier summary judgment on the retaliation claim Anderson has pled. Because the Court denied Anderson's Motion for Leave to Amend, there is no FMLA retaliation claim on which to rule.

**CONCLUSION**

For the reasons discussed above, ICP/Carrier's Motion for Summary Judgment (Doc. No. 31) will be GRANTED and judgment entered in its favor on all counts.

The Court will enter an appropriate order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE